**Opinion issued February 3, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-25-00640-CV**

————————————

**IN THE INTEREST OF J.C.D.Y. A/K/A J.Y., J.E.D.Y. A/K/A J.Y., M.M.D.Y. A/K/A M.Y., J.T.D.Y., A/K/A J.Y., Children**

———————————————————————————————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-00167J**

———————————————————————————————————

## MEMORANDUM OPINION

C.B.A.K. ("Mother") challenges the trial court's final order terminating her parental rights to her minor children J.C.D.Y. a/k/a J.Y. ("Jack"), J.E.D.Y. a/k/a J.Y. ("John"), and M.M.D.Y. a/k/a M.Y. ("Mark"), denying Mother access and possession to her daughter J.T.D.Y. a/k/a J.Y. ("Julie"), and appointing a non-parent caregiver as Julie's sole managing conservator. Mother argues there is legally and

1

factually insufficient evidence supporting the trial court's findings that (1) Mother committed the predicate acts under Family Code Section 161.001(b)(1)(E) and (P), and (2) termination of her rights was in Jack, John, and Mark's best interest.[1] She also argues that the trial court abused its discretion by appointing the Department of Family and Protective Services as sole managing conservator for Jack, John, and Mark and appointing a non-parent caregiver as Julie's sole managing conservator.

We affirm the trial court's order modifying the prior order as to Julie and the decree terminating Mother's parental rights to John, Jack, and Mark.

**Background**

Mother has six children: J.T.D.Y. a/k/a J.Y. ("Julie"), J.C.D.Y. a/k/a J.Y. ("Jack"), J.E.D.Y. a/k/a J.Y. ("John"), M.M.D.Y. a/k/a M.Y. ("Mark"), M.D.K.G. a/k/a M.Y. a/k/a M.O.D.Y. ("Mike"), and I.E.J. a/k/a I.J. ("Ivan").[2] The family has been involved with the Department of Family and Protective Services ("Department")[3] since at least March 1, 2014, when the Department received a referral for child abuse and neglect by Mother against Mike, Julie, Jack, and John.

---

[1]    To protect the identity of the minor children, we refer to them and their foster parents by pseudonym and we refer to the children's biological parents as Mother and Father. *See* TEX. R. APP. P. 9.8(b)(2).

[2]    Mike's father is K.G., Ivan's father is N.D.J., and Julie, Jack, John, and Mark's father is M.Y.

[3]    For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

2

According to the Department, Mother and the children were living in "deplorable conditions" in a filthy, cluttered home containing "a lot of marijuana" that did not have "a sink, a bathroom shower or tub." Mother, who was then pregnant with Mark, had used marijuana the day before and her speech was slurred, her eyes were "red bloodshot, and she could not carry a conversation."

Two months later in May 2014, the Department received another referral for abuse after Mother and Mark tested positive for marijuana at Mark's birth. The Department provided Mother with a family-based safety services plan that required her to refrain from illegal drug use and submit to random drug testing. According to the Department, Mother maintained her sobriety for five months and "appear[ed] to have resolved the safety concerns that led to the Agency's involvement."

In May 2019, the Department received another referral for physical neglect from Julie's teacher alleging that Julie's hygiene was deteriorating, her clothes had "a very strong smell of urine," she was "very skinny," she "often want[ed] to take food home with her," and the "utilities [were] not often working" in Julie's home.

The Department also received a referral from Mike's father in February 2020 for neglect and abuse after he discovered that Mother and the children had been living in a single hotel room for a week. According to the referral, the hotel room was dirty, there were no sheets on the bed, and Mike reportedly slept on the floor. Mike's father stated that Mike smelled like mildew, his hair was smelly and matted,

3

and he was not wearing socks. Mike claimed he had gotten into trouble recently for taking a bath, and he refused to leave with his father because he was afraid to leave his siblings. According to the referral, Mike was skinny, he appeared malnourished, his leg bones protruded, and he told his father that sometimes he went to bed without food. Mike, who had not been in school in a month, told his father that he was left to care for his five younger siblings, including two-year-old Ivan, when Mother went out. According to Mike, Mother and her boyfriend spent all their money on marijuana, and he had seen Mother smoke marijuana.

None of these referrals resulted in the children being removed from Mother's care.

### Petition to Terminate Mother's Parental Rights

In February 2022, the Department filed an Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship seeking to terminate Mother's parental rights to Mike, Julie, Jack, John, Mark, and Ivan based on new allegations that Mother had physically neglected and abused the children. The removal affidavit attached to the petition states that law enforcement referred the family to the Department after officers discovered the six children home alone living in abject squalor. According to the officers, there were multiple rats running through the home, rat holes in the walls, piles of black trash bags in the kitchen and living room, roaches crawling out of the bags, and "an odor

4

of urine" emanating from within the home. It appeared that the children had not bathed in "a few days," and Ivan, who was three years old, had scratches and marks on his body and scars from old injuries.

When Department Investigator Brandy Whitely visited the home the next day, all of the children had "a strong, musty, urine and filth stench that could be smelled when the door opened," they did not appear to have bathed "for quite some time," heir grooming was in poor condition, their hair "severely matted," and their clothes were "soiled with a foul odor." The conditions Whitely witnessed were not "livable for the children." The carpets and walls were very dirty, the living room furniture was "soiled with no cushions on them," there were "bags of trash throughout the home," there were no televisions, and "loose wiring was seen hanging out the walls throughout the home." She saw "several rats and roaches in the home, mainly in the kitchen and dining area," and there was a "huge pile of garbage" in the dining area that "had numerous rodents being seen hiding within it."

Whitely stated there was no food in the house. The kitchen did not have a refrigerator or a working stove or microwave, and the kitchen cabinets were bare. According to Whitely, there were no cups, plates, utensils, pots, or pans in the kitchen. Whitely found a deep freezer in the laundry room, but it was empty. The laundry room was filled with soiled clothes on the floor. The children's bathroom was completely unusable. According to Whitely, there was no running water in the

home, the toilet was backed up and there was feces and urine in the toilet and bathroom sink. The bathroom sink countertop was broken and the tile on the floor was soiled as well. Although it was a three-bedroom home, "only the master bedroom had a bed that contained a soiled mattress topper" and that belonged to Mother. The master bedroom had several trash bags filled with soiled clothes all over the floor. Whitely did not see any beds in the home for the children or anything the children could use as beds.

Mike told Whitney that he had been suffering from a toothache for two weeks and the children had not been in school for a "few months." According to Mike, Mother had left the house on Friday morning. Julie, who did not want to speak with Whitely at first, appeared to have been coached on what to say to the Department and gave inconsistent explanations for Mother's absence. Jack, John, Mark, and Ivan refused to speak to Whitely, and Ivan was dirty and wearing a soiled diaper.

After multiple attempts to contact Mother over four hours, Whitely was eventually able to reach Mother, who seemed unconcerned that law enforcement and the Department were at her home until she was told that the children would be removed due to the environment and because no caregiver was present. When Mother arrived home, she "downplayed the home conditions and said they were remodeling the home, without addressing why there were rats, roaches and feces all over the home and in the bathrooms." Mother was arrested at the scene for child

endangerment and abandonment, and the children were taken into the Department's care.

The next day, a Department supervisor spoke to Mike and Julie who reported that "mother had left on Friday morning and did not return until Sunday night" when the investigator was at the home. Mike and Julie told the supervisor that "they should have cleaned better that way they would not been taken from their mother." They told the supervisor that Mother, who "leaves the[m] alone all the time," would "leave for a couple of days then would come back for a day two and leave again" and this had "been going on for at least 6 months." Although Mother would leave food for the children, they would run out of food, and they had trouble contacting Mother when she was away. Mike told the supervisor that Ivan's father was "not around much and it's a good thing" because he was "abusive to his mother" and he had "seen him hit his mother." They told her that they had never seen Mother use drugs.

The case was tried to the court over four days in May, June, and July 2023.

In September 2023, the trial court signed an order terminating Mother's parental rights to Mike pursuant to Section 161.001(b)(1)(D), (E), (O), (J), and (P), appointing Mike's father as his sole managing conservator, terminating Mother's parental rights to Ivan pursuant to Section 161.001(b)(1)(D), (E), (O), (P), and appointing the Department as Ivan's sole managing conservator. The trial court also appointed the Department as Julie, Jack, John, and Mark's sole managing

7

conservator, appointed Mother as their possessory conservator, awarded Mother supervised therapeutic visitation with the children once a month, and ordered Mother to pay monthly child support for Julie, Jack, John, and Mark.

Mother appealed the portions of the order terminating her parental rights to Mike and Ivan. In March 2024, this court overruled Mother's sole issue challenging the trial court's finding that termination of her rights to Mike and Ivan was in their best interest and we affirmed the September 2023 order. *See In re J.C.D.Y.*, No. 01-23-00713-CV, 2024 WL 1334334 (Tex. App.—Houston [1st Dist.] Mar. 29, 2024, pet. denied) (mem. op.). A detailed rendition of the events that transpired through July 24, 2023—the last day of trial—is set forth in our prior opinion.

## Post-July 2023 Events

In February 2024, while Mother's appeal of the September 2023 order was pending in this Court, the Department provided Mother with an updated family service plan ("FSP"). Mother's updated FSP states that Mother "exhibits the lack of parenting knowledge and skill[,] is in denial of leaving her children unsupervised," and "is against the children's recent diagnosis which does not support the children's growth and development."[4] It further states that although Mother had completed her

---

[4] Ivan had been diagnosed with autism, developmental delays, and encephalopathy. *In re J.C.D.Y.*, No. 01-23-00713-CV, 2024 WL 1334334, at *33 (Tex. App.—Houston [1st Dist.] Mar. 29, 2024, pet. denied) (mem. op.). Julie had been diagnosed with anxiety and oppositional defiant disorder and Mike had been diagnosed with ADHD. *Id.* at *7. Jack had been diagnosed with ADHD, major depressive disorder,

8

parenting classes and individual therapy, she nevertheless "appears to be in deep denial about the negative effects of her absenteeism, neglect and poor parenting has affected her children negatively[,] vehemently denies all allegations of abuse and neglect the children bring up regarding their time under her care and will then deflect and blame anything the children allege on their time in [the Department's] care."

The Department stated in Mother's updated FSP that it was worried Mother would "neglect and cause physical harm to the children, which may cause death by physical abuse or malnourishment." The FSP kept in place the requirements that Mother secure and maintain housing while the case was pending, provide the Department with proof she had "adequate housing that is hygienic and safe for her children's security," provide the Department with proof of her sources of income, complete parenting classes, complete a psychosocial evaluation and follow any recommendations, and complete individual counseling.

The updated FSP states that Mother "currently uses marijuana" and is "alleged to have used it around her children previously." It further states that Mother "sporadically participates in drug tests required by the agency [and] recently tested positive for illicit substances in December 2022." The plan continued to require Mother to complete a substance abuse evaluation and follow any recommendations

---

generalized anxiety disorder, and "mixed disturbance of emotions and conduct" and John had been diagnosed with ADHD-specified trauma and "stress-related disorder due to multiple transitions" after he came into care. *Id.*

and submit to random drug tests. The FSP stated that any refusal to test or missed appointment for testing would be considered a positive result and required Mother to complete substance abuse services if any of her drug tests were positive.

In June 2024, Jack, John, and Mark participated again in psychological evaluations. All three boys were living in the same foster home since October 2023, and they had monthly in-person and weekly virtual visits with their siblings. Jack, John, and Mark received counseling, and Jack and Mark needed special education services because of their educational deficiencies and/or learning disorders. The assessments reflected that Jack, John, and Mark appeared to be the victims of repeated trauma including maternal neglect and physical abuse and all three boys would benefit from a highly structured and nurturing environment. Jack, who had reported that when he lived with Mother he and his siblings often went without food and Mother was often not home, "seemed quite content in his current placement," had a good appetite, and was sleeping well.

**Motion to Modify Conservatorship and Second Termination Proceeding**

In October 2024, the Department filed an Original Motion to Modify for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship seeking to terminate Mother's parental rights to Jack, John, Mark and Julie. The Department asked the trial court to appoint "a relative or other suitable person" as the children's sole managing conservator if the children could not safely

be reunified with Mother but could be permanently placed with that person, and if neither placement was possible, the trial court should appoint the Department as the children's permanent sole managing conservator. The Department later abandoned its request to terminate Mother's parental rights to Julie and asked the trial court to appoint a non-relative M.F. ("Mary") as Julie's sole managing conservator. The case was tried to the bench on April 15 and May 15, 2025.

## A. Trial Testimony

### 1. Foster Mom

Jack, John, and Mark's foster mother testified that the boys were placed in her home in October 2023. According to the foster mother, the boys were removed from Mother's care in 2022 after police officers found the children unsupervised in a home that was not "feasible for living." According to the foster mother, none of the children had been enrolled in school while in Mother's care, they lacked adequate food, and reported they were at one point living in a car. She testified that the boys had scars on their bodies, and they told her that "some of their permanent marks and whips came from [Mother]," and that "a lot of the bruising" was caused by Mother and their maternal grandmother. They told her that "they always did something bad," but "sometimes they didn't do anything, but they still got a whooping."

When Jack, John, and Mark first came to her home, "they were not used to having food," they ate until they "literally got sick," they stole food, and there "was

11

never a time when they [weren't] hungry." She told them they did not need to steal and could eat whenever they were hungry and the boys' constant eating and stealing food eventually stopped. Their low self-esteem had also improved.

The foster mother testified that Jack was fourteen years old, earned As and Bs in school, and he played sports. He received special education services and took medication for his ADHD. When asked about the biggest change she saw in Jack since he moved into her home, the foster mother testified that Jack "is less stressed," and although he had been distant initially and did not want to get close to others, "now he's very loving." He told his foster mother he loved her, "that he's extremely happy where he is, and he thanks me all the time." He also told her "all the time" that he wanted to remain in her home.

John was thirteen years old, he played sports, and though he continued to struggle with math, he received all As and Bs in his other classes. He also received special education services and took medication. Since being placed in her care, John had become less aggressive, shared his thoughts, and communicated "very well."

Mark, who was ten years old, earned As and Bs in school, received special education services, and he took medication for his ADHD. The biggest change the foster mother noticed in Mark is that he developed a love of reading while he lived in her home.

The foster mother testified that she and her husband guided the boys "with first, love," took them to church, encouraged them to do well in school, and she attended all their school meetings. The foster parents disciplined the boys by "sit[ting] them down and [talking] with them" and telling "them what they did wrong and what better choices . . . they need to make." The foster mother also arranged visits between the boys and Julie, and the foster mother did not have any concerns about the boys' behavior.

According to the foster mother, she and her husband were able to provide for all the boys' needs and her plan for the boys was to become educated, graduate high school, go to college, get a job, and do "something that makes them happy." She testified that all three boys called her mom, they loved their foster father, and they all expressed the desire to remain in their foster home. She and her husband wanted to adopt Jack, John, Mark, and their younger brother, Ivan, who had been placed in her home in August 2024.

### 2. Jane Piaskowski, Child Advocates

Jane Piaskowski with Child Advocates is Julie, Jack, John, and Mark's guardian ad litem. Piaskowski, who testified during the first trial, testified that the children were removed from Mother's care in 2022 based on the unsafe conditions inside the home, and because the children lacked food, were sleeping in one bed, and blamed each other for eating too much.

Jack disclosed to Piaskowski that he had been physically abused and he had visible marks on his arms, and the other boys made similar reports. They described witnessing domestic violence as well as "conflict and parental separation within the home," and having "multiple caregivers over different periods of time; as well as physical abuse and neglect, and an absence of consistent food and caregiving."

Piaskowski testified that Jack, John, and Mark were living in an emergency shelter when the first trial occurred, and the boys did not want Mother's rights terminated. However, since that time, they each told her they wanted to remain with their foster parents. According to Piaskowski, Jack told her that he wanted to stay with his foster family and his brothers on a permanent basis and "requested that if it's possible that he not change . . .homes or schools or anything like that in the future . . . ." He became much more expressive and confident while living with his foster parents and he had "really come into his own" as the leader of his younger brothers. John, who also wanted to remain in the foster home, was "very enthusiastic and asks [Piaskowski] frequently when he can be adopted." John had become more expressive and artistic. According to Piaskowski, Mark was initially quiet and "very sensitive," but he had "come into his own" since he was placed with his foster parents. He now loved school, was more confident, excited to start football, and loved music and singing. Piaskowski visited the children monthly and said the boys were "all very close" and they had become "very natural and joyful." According to Piaskowski, the

14

boys had developed a deep affection for their foster family, and their niece who lives with them.

Julie, almost seventeen years old, was living with Mary, a family friend whom Julie referred to as grandma. Piaskowski testified that Julie performed well in school, had a part-time job, was "incredibly driven" to succeed, was diligent in her classes, and aspired to attend college and obtain a nursing degree. Mary was "very attentive" to Julie's needs and desires, and they would "go out and spend time together." According to Piaskowski, Mary "is a wonderful caregiver" for Julie, and she had no hesitation recommending that Mary be named as Julie's managing conservator. Piaskowski also recommended that Julie continue to visit with Mother in a supervised therapeutic setting. According to Piaskowski, Julie was at a pivotal point in her life and Child Advocates wanted to "make sure that the influences and people around her do truly have her best interest at heart." Piaskowski was concerned because she could not say "with confidence that mom is that, necessarily."

Piaskowski testified that although Julie had not disclosed to her that she had been physically abused while in Mother's care, Julie had disclosed during a forensic interview in the 2022 case that physical abuse "was a part of the situation" in Mother's home. Julie also made an "outcry of sexual abuse" during the forensic interview. According to Julie, Mike, Mother, and Julie's maternal grandmother were aware of the sexual abuse. According to Piaskowski, Julie feels responsible for the

children being taken away from Mother and Julie often "said that if she had kept the house cleaner or taken better care of the boys they would not have been placed in foster care."

Piaskowski testified that although the trial court had ordered Mother and the children to have monthly visits supervised by a licensed family therapist, there had been difficulty scheduling those visits because the therapists the Department planned to use asked to be removed from the case. She testified she had observed one visit, two or three other visits occurred in person, and other visits were virtual. The first therapist who supervised the visits asked to be removed from the case due to scheduling issues. A second therapist withdrew as well and there was a period of months during which the Department and Piaskowski were unable to find another therapist to supervise visits between Mother and the children.

According to Piaskowski, there was a time when the boys refused to visit Mother. In January or February 2025, a visit was scheduled and each of the boys asked whether they were required to go. Piaskowski said she spoke to the boys and "each of them independently said that they would prefer not to attend those visits."

Piaskowski testified that in 2023 Mother had violated the no-contact order in place during the prior proceeding and Piaskowski knew of one occasion when Mother had unsupervised contact with the boys through a video call they were on with Julie. Piaskowski was aware that Julie was communicating with Mother without

16

therapeutic supervision, though Piaskowski was "not sure by what means." She said, though, that both Mother and Julie expressed things they would not know "unless they were in close communication."

According to Piaskowski, Mother's visits with the children were required to be supervised because the children's therapists were concerned that Mother would not abide by any rules set by the court. Piaskowski testified that Mother "still hasn't acknowledged any kind of responsibility or accountability" and Child Advocates "wanted to make sure that someone would be there to be protective of the children because we couldn't be confident that Mom would be."

Regarding Mother's required services, Piaskowski testified that Mother completed substance abuse treatment but then tested positive in drug tests on multiple occasions following that treatment. Mother's most recent positive result was in December 2024. Piaskowski said that there were multiple occasions on which Mother refused to participate in drug testing, and more specifically tests of her hair.

### 3. Marion Hackett

Marion Hackett, who was assigned the case in December 2024, is the current conservatorship caseworker for Jack, John, Mark, and Julie. She testified that the children had not made any outcries of physical abuse to her.

Hackett testified that Mother had provided the Department with proof of housing and income, and she had been employed during the four months before trial

17

began in April 2025. When she visited Mother's home in January or February 2025, Hackett saw furniture, clothing for mom, and "things of that nature." Mother had not told Hackett what she planned to do when her lease expired in June 2025. Hackett testified that Mother indicated she was willing to meet with Hackett in Hackett's office, but they had not been able to do so.

Hackett testified that Mother was compliant with her FSP except for the random drug testing requirement. After she was appointed to the children's case in December 2024, Hackett sent Mother for random drug testing twice a month (urinalysis) and hair follicle testing once every three months, but Mother had taken only half of the tests. According to Hackett, Mother told her that she was not able to submit to testing because she had to work or had her hair done. Hackett testified that although Mother had been successfully discharged from a substance abuse program in 2022 and a second substance abuse program in May 2023, Mother's hair tested positive for marijuana in June 2023.

Julie, who had expressed aspirations to pursue a nursing degree, told Hackett that she wanted to continue living with Mary and have a relationship with Mother. Hackett testified that Jack, John, and Mark, who had been living in an emergency shelter when the September 2023 order was signed, were happy and thriving in their current adoptive placement. According to Hackett, the foster parents, whom the boys refer to as mom and dad, had provided the boys with a stable and loving home that

met all their needs. Hackett testified that Jack, John, and Mark wanted their foster parents to adopt them.

Hackett testified that when Jack, John, and Mark lived with Mother, the children lacked adequate food, did not have their own beds, did not engage in "normalcy activities," and did not attend school. They had marks and bruises on their body from physical abuse perpetrated by Mother and were often left home alone without food or adult supervision. Hackett testified that although the court had required Mother to have monthly therapeutic visits with the children, the Department had difficulty the last two years finding a therapist who would supervise visitation, and it was not Mother's fault that those visits had not occurred.

According to Hackett, there had been material and substantial changes since the September 2023 order was signed that warranted termination of Mother's rights, including the boys' transition from an emergency placement to an adoptive placement, Mother's positive drug tests, and Mother's failure to take "accountability for what's transpired in the past." Hackett testified that the Department wanted the court to terminate Mother's parental rights to Jack, John, and Mark in part because Mother had not taken responsibility for "the physical abuse and the neglect" that occurred before the September 2023 order.

### 4. Mike

Mike is seventeen years old and Mother's oldest child. He testified that the Department terminated Mother's rights to him in the September 2023 order and although he now lived with his father, he had remained in contact with Mother and saw her regularly. Mike testified that Mother never abused or neglected him or used drugs in front of him and she had provided him with a safe and stable home. According to Mike, there were two beds in the home that everyone shared, and he never felt that there was not enough to eat. Mike testified that Mother was a caring and loving parent and a good mother, and he asked the court not to terminate Mother's rights to his siblings.

When told that his trial testimony that Mother had never abused or neglected him conflicted with statements he gave to the Department when he was taken into care in 2022, Mike testified that the Department had misled him about Mother and based on the Department's statements, he had believed that he would never be reunited with her. Mike testified that speaking to Mother had "changed him," and he questioned the truthfulness of the Department's statements to him about her.

Mike acknowledged that the statements he gave to the Department in 2022 were probably correct, but it had been so long that he did not remember everything he said. He remembered telling the Department that Mother would frequently leave him and his siblings for days at a time and that they were not enrolled in school.

20

Mike testified that sometimes other adults would come to the home, and Mother would come home after they left. He did not remember Mother leaving him and his siblings at home alone overnight.

### 5. Mother

Mother testified that she had been employed since January 14, 2024, had been living in her current home for a year and a half, and she was renewing her lease, which was due to expire in June 2025. She testified that she never used marijuana around her children and had never been arrested on a drug-related charge. She testified that she had a good relationship with Mike.

Mother testified that she was granted monthly therapeutic visitation with the children in the September 2023 order, and although she tried to visit with Jack, John, Mark, and Julie, Mother was denied the opportunity to do so because the Department was not able to provide the visitation. According to Mother, one therapist ended therapy because of lack of communication with the Department. Mother testified that the Department's failure to arrange for visits with Jack, John, Mark, and Julie had denied her an opportunity to bond with them, and she would have had a closer relationship with the children if the Department had arranged for the monthly visits.

When asked if she had taken responsibility for her behavior that brought her children into care, Mother testified that she had taken responsibility and she "a hundred percent" understood the conditions of her home and that she was "supposed

to be home more hours." Mother testified she had learned from the parenting classes she attended what she had done wrong in the past and how she could change her behavior.

Mother testified that the reason her home looked the way it did was because the family had been isolated during the pandemic, and she had COVID and could not clean. According to Mother, she was in middle of remodeling when the children were removed. She stated that she tried to plunge the toilet but was told by the men who were renovating her house that they would fix it. She testified that the children were getting three meals a day, and that she cooked breakfast, lunch, and dinner for them. When she was not at home, she would send the children "Uber Eats," or "Walmart groceries." Mother testified that before Jack, John, and Mark were removed from her care in 2022, the boys had been doing well academically, and Jack was receiving special needs help from his school.

With respect to the Department's concerns about her marijuana use, Mother denied using marijuana after she completed substance abuse counseling in November 2022. She did not recall being discharged from a second substance abuse program in May 2023. Mother acknowledged that a hair follicle test in December 2024 had been positive for marijuana but she stated she had not used any illegal substances for over a year and a half. She was unaware of any positive urinalysis

results after 2022. According to Mother, her doctor had suggested that she try "CBD gummies" and she had been using them since August 2024.

When asked about the scars on the children's bodies when they first came into the Department's care in 2022, Mother testified that Jack's father had "put an iron" on Jack's leg when he was younger, and the other scars were from accidents at school and chicken pox. Mother denied speaking with Mike and Julie in May 2022 in violation of a no-contact order or blaming Mike and Julie for the children's removal from her home.

Mother acknowledged that Jack, John, Mark, and Julie were doing well in their current placements, and she testified that she "truly want[ed] what's best for my children." She testified that if Jack, John, Mark, and Julie were not returned to her care, it was in their best interest to remain in the Department's conservatorship to allow Mother additional time to address any of the Department's lingering concerns about her and have an opportunity to place the children with "accurate family members."

On July 24, 2025, the trial court signed a final order finding that Mother had committed the predicate grounds for termination under Section 161.001(b)(1)(E), (O), and (P), and that termination of Mother's parental rights to Jack, John, and Mark

23

was in the children's best interest.[5] The court terminated Mother's parental rights to Jack, John, and Mark and appointed the Department as the boys' sole managing conservator. The court found that it was not in Julie's best interest to appoint Mother as Julie's managing conservator because Mother's appointment would impair Julie's physical health or emotional development. The trial court appointed Mary as Julie's sole managing conservator and denied Mother possession or access to Julie.

This appeal followed.

## Termination of Parental Rights

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a]

---

[5] The Texas Legislature amended Family Code Section 161.001(b)(1) and repealed Subsection (O), effective September 1, 2025. *See* Act of May 16, 2025, 89th Leg., R.S., ch. 211, § 2, 4, 2025 Tex. Sess. Law Serv. 573, 574–75; *In re D.M.*, No. 11-25-00102-CV, 2025 WL 2980658, at *1 n.2 (Tex. App.—Eastland Oct. 23, 2025, no pet.) (mem. op.). The repeal applies only to suits affecting the parent-child relationship pending on or after the effective date. *See In re D.M.*, 2025 WL 2980658, at *1 n.2. Because the Texas Legislature repealed former Subsection (O), Section 161.001(b)(1)(P) is now Subsection (O).

Any references to Section 161.001(b)(1)(O) and Section 161.001(b)(1)(P) in this memorandum opinion are to the previous version of the statute that was in effect on July 24, 2025—the date the trial court signed its order terminating Mother's parental rights to Jack, John, and Mark.

parent[ ] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

Termination can be achieved following a prior order denying termination through either Section 161.001 or Section 161.004 of the Family Code. *See In re K.P.*, 498 S.W.3d 157, 170 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.—Fort Worth 2011, pet. denied).

A court may terminate the parent-child relationship under Section 161.001 if the Department establishes, by clear and convincing evidence, that (1) the parent has engaged in one or more of the enumerated predicate acts or omissions under Section 161.001(b)(1), and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). "Both elements must be established, and termination may not

be based solely on the best interest of the children as determined by the trier of fact." *In re M.A.J.*, 612 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2020, pet denied). "[A] trial court can terminate the parent-child relationship, even though it previously denied termination in another order, using section 161.001 alone if termination is sought on *evidence of acts or omissions having occurred since the earlier order in which termination was denied*." *In re D.N.*, 405 S.W.3d 863, 870 (Tex. App.—Amarillo 2013, no pet.) (emphasis in original).

Section 161.004 provides an alternative method for termination following the rendition of an order that previously denied termination if (1) termination is in the child's best interest, (2) the new petition to terminate was filed after the date of the prior order denying termination, (3) the parent committed an act listed under Section 161.001 before the date of the prior order denying termination, and (4) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the prior order have "materially and substantially changed" since the date of the order. TEX. FAM. CODE § 161.004(a). At a hearing under Section 161.004, "the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child." *Id.* § 161.004(b).

"There are no definite guidelines as to what constitutes a material and substantial change in circumstances under [Section] 161.004." *In re N.R.T.*, 338

S.W.3d 667, 679 (Tex. App.—Amarillo 2011, no pet.). Instead, courts make this determination based on the facts of each case. *Id.* Courts have found evidence of a material and substantial change when among other things, a child has moved from a non-adoptive placement to an adoptive placement. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *12 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) ("The fact that Ken was in an adoptive placement in 2017 is a material and substantial change in his circumstances since the rendition of the previous order in April 2015."); *In re J.R.*, No. 07–12–00003–CV, 2012 WL 1605738, at *4 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (observing that children, who were in foster homes, were "significantly closer, both psychologically and logistically, to places in which they seek adoptive families and stability," thereby supporting finding of material and substantial change in circumstances). A material and substantial change in circumstances may be established by either direct or circumstantial evidence. *In re A.L.E.*, 279 S.W.3d 424, 429 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Due to the elevated burden of proof in termination cases, courts do not apply traditional factual and legal sufficiency of the evidence standards. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) (rejecting application of traditional sufficiency standards when clear and convincing burden of proof applies). In a legal sufficiency review of a trial court's findings of fact where a clear and convincing evidence standard

applies, "'[we] look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We must "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020) (quoting *In re J.F.C.*, 96 S.W.3d at 266). "In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). But if we "determine[ ] that [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true," the evidence is legally sufficient. *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

For a factual sufficiency review of a finding where a clear and convincing evidence standard applies, we review the entire record in a neutral light, giving due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. In contrast to the legal sufficiency review:

28

a factual-sufficiency review is premised on consideration of the entire record. The assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains. However, rather than "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true.

*In re Commitment of Stoddard*, 619 at 674–75 (internal citations omitted). If the evidence would allow a reasonable factfinder to form a firm belief or conviction about the truth of the challenged finding, and the evidence contrary to the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually sufficient. *In re J.F.C.*, 96 S.W.3d at 266.

Under both legal and factual sufficiency standards, the trial court is "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). As the sole factfinder in a bench trial, it is the trial court's province to weigh the evidence and resolve any evidentiary conflicts. *See In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Because of the fact-intensive nature of review of parental termination cases, appellate courts afford great deference to the factfinder on issues of credibility and demeanor because the factfinder "faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.J.G.*, 540 S.W.3d 44, 56 (Tex.

App.—Houston [1st Dist.] 2017, pet. denied) (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)).

## Termination under Section 161.004

The trial court terminated Mother's parental rights to Jack, John, and Mark pursuant to Family Code Section 161.004. In the July 2025 Order, the trial court found (1) there had been a previous denial of termination of Mother's parental rights to Jack, John, and Mark, (2) "the circumstances of the children, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination ha[d] materially and substantially changed since the date the order was rendered," (3) Mother "committed an act listed in 161.001 before and after the date denying termination was rendered," and (4) termination of Mother's parental rights was in the best interest of Jack, John, and Mark.

## Mother's Appeal

In her first, second, and third issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that she committed the predicate acts for termination under Sections 161.001(b)(1)(E), (O), and (P) of the Family Code. In her fourth issue, she argues that termination of her parental rights was not in the best interest of Jack, John, and Mark. And in her fifth issue, she argues the trial court abused its discretion in appointing the Department

as sole managing conservator of Jack, John, and Mark, and in appointing Mary as the sole managing conservator of Julie.

## Predicate Findings

### A.    Endangerment Finding Under Section 161.001(b)(1)(P)

Under Section 161.001(b)(1)(P), a parent's rights may be terminated if clear and convincing evidence establishes the parent "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child" and either "failed to complete a court-ordered substance abuse treatment program" or "after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance." TEX. FAM. CODE § 161.001(b)(1)(P).

The term "endanger" encompasses a broad "array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct that subjects child to life of uncertainty and instability endangers child's physical and emotional well-being). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The danger to the child may be inferred from parental misconduct,

31

even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"); *see also In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (stating parent's conduct with regard to other children can support finding of endangerment).

Evidence of a parent's illegal drug use may support a finding of endangerment. *See In re J.O.A.*, 283 S.W.3d at 345. In *In re R.R.A.*, the Texas Supreme Court clarified the connection between a parent's illegal drug use and endangerment of a child. The court confirmed that endangerment does not require a parent's drug use to harm the child directly. Instead, "a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." 687 S.W.3d at 278. The court explained:

> While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345) (emphasis in original); *see also In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (stating *In re R.R.A.* requires "holistic endangerment review"). For example, "[w]hen a pattern of drug use is coupled with

credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)." *In re R.R.A.*, 687 S.W.3d at 281; *see id.* ("Father's positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop Father's continued pattern of drug use.").

The court held in *In re R.R.A.* that the lower court "should not have ignored the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial," and the court "reasonably could have inferred that this conduct, in the aggregate, endangered the children's physical and emotional well-being." *Id.*

## B.    Analysis

The record reflects that Mother used marijuana in March 2014 while she was pregnant with Mark. She and the children were living in "deplorable conditions" and when Mark was born in May 2024, she and Mark tested positive for marijuana. *See In re H.M.O.L.*, 2018 WL 1659981, at \*13 ("Illegal drug usage during pregnancy is also conduct that endangers the physical and emotional well-being of the unborn child."); *In re S.F.*, No. 07-24-00310-CV, 2025 WL 424727, at \*4 n.9 (Tex. App.—Amarillo Feb. 6, 2025, pet. denied) (mem. op.) ("Marijuana is a controlled substance

under Chapter 481 of the Health and Safety Code.") (citing Tex. Health & Safety Code §§ 481.002(5), .032).

The evidence also reflects that Mother and the children had been living in a motel room for a week with only one bed when the Department received a referral from Mike's father in February 2020 involving allegations of drug use and neglect. Mike's father alleged that Mother and her boyfriend had spent all the family's money on marijuana, and Mike had seen Mother smoke marijuana. He alleged that the hotel room was dirty, that Mike appeared malnourished, and that Mike stated he sometimes went to bed without food.

During the pendency of the 2022 case, Mother tested positive for marijuana several times, even after she was successfully discharged from a substance abuse program. Mother tested positive for marijuana on May 11, 2022 (hair and urine) and May 17, 2022 (urine). Although she was successfully discharged from a substance abuse program on November 16, 2022, she tested positive for marijuana on November 30, 2022 (urine), December 13, 2022 (urine), December 15, 2022 (hair), March 14, 2023 (hair), and March 15, 2023 (hair). After being discharged successfully from a second substance abuse program on May 9, 2023, Mother relapsed and tested positive for marijuana less than a week later on May 15, 2023 (hair) and again on June 20, 2023 (hair) while trial in the 2022 case was in progress. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet.

34

denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.") (quoting *In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *9–10 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (mem. op.)). This evidence demonstrates that Mother repeatedly tested positive for marijuana while the children were in the Department's care, despite knowing that her parental rights were at stake and that she was required to stop using marijuana before the children could be returned to her care, and thus supports the trial court's finding of endangerment. *See In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being."); *see also In re R.R.A.*, 687 S.W.3d at 281 (recognizing parent's "positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop[ed] [his] continued pattern of drug use"); *In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary,

35

deliberate, and conscious conduct that endangered the well-being of her children.") (quotation omitted).

The evidence reflects that Mother's marijuana use occurred when Mother and the children were living in unsafe and unsanitary conditions in 2014. And it also reflects that in 2020, Mother was spending all her money on marijuana while she and the children were living in a motel room, that the hotel room was dirty, and that the children went to bed without food sometimes. Some of the children had not been in school in a month and Mother would go out leaving the children alone. Based on this evidence, a rational factfinder could reasonably infer that Mother's "difficulties in providing shelter and support for" for the children "were related to [her] drug use." *In re R.R.A.*, 687 S.W.3d at 279; *see id.* at 281 ("When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E).").

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that prior to the September 2023 order, Mother used a controlled substance in a manner that endangered the health or safety of Jack, John and Mark, and Mother continued to abuse a controlled substance after she completed a court-ordered substance abuse treatment program. TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at

266; *see also* TEX. FAM. CODE § 161.004(a)(3) (requiring finding parent committed predicate act "before the date the order denying termination was rendered").

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that prior to the September 2023 order, Mother used a controlled substance in a manner that endangered the health or safety of Jack, John, and Mark, and Mother continued to abuse a controlled substance after she completed a court-ordered substance abuse treatment program. TEX. FAM. CODE § 161.001(b)(1)(P)(2); *In re J.F.C.*, 96 S.W.3d at 266; *see also* TEX. FAM. CODE § 161.004(a)(3).

We overrule Mother's third issue.[6]

---

[6] Mother does not challenge the trial court's finding that the circumstances of the children, a conservator, or other party affected by the order have materially and substantially changed since the rendition of the September 2023 decree. *See In re J.D.R.G.*, No. 01-18-00469-CV, 2018 WL 6175321, at *6 (Tex. App.—Houston [1st Dist.] Nov. 27, 2018, pet. denied) (noting that unchallenged findings of fact are binding on appellate court "unless the contrary is established as a matter of law, or if there is no evidence to support the finding").

When the September 2023 decree was rendered, Jack, John, and Mark were placed in an emergency shelter and the boys did not want Mother's rights terminated. They boys were in an adoptive placement when the 2025 decree was rendered and they had expressed that they wanted to remain in their current placement. The fact that Jack, John, and Mark were in an adoptive placement in 2025 is a material and substantial change in their circumstances since the rendition of the prior decree. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *12 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (holding there was sufficient evidence supporting trial court's finding of material and substantial change in circumstances when child, who had not been in adoptive placement when first petition to terminate was denied, was in adoptive placement).

## C. Endangerment Finding Under Section 161.001(b)(1)(E)

In her first and second issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that she committed the predicate acts for termination under Sections 161.001(b)(1)(E) and (O) of the Family Code. Under Section 161.001(b)(1)(E), a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). And under Section 161.001(b)(1)(O), a parent's rights may be terminated if the trial court finds by clear and convincing evidence that a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* § 161.001(b)(1)(O).[7]

---

Evidence that Mother continued to use marijuana after the September 2023 decree also supports the trial court's finding of a material and substantial change in circumstances. *See In re J.R.P.*, 526 S.W.3d 770, 779 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding trial court did not abuse its discretion in finding material and substantial change in parent's circumstances considering evidence of parent's drug relapse after first petition to terminate was denied).

[7] The legislature repealed Subsection (O) effective September 1, 2025. H.B. 116, Act of May 28, 2025, 89th Leg., R.S., ch. 211, 2025 Tex. Sess. Law Serv. The repeal

Ordinarily, it would be necessary for us to review the trial court's finding under Subsection (E) because termination of parental rights on this basis can serve as the basis for termination of a parent's rights to another child in the future. *See N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (stating due process requires review of trial court's findings under Subsection (E) "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child"); TEX. FAM. CODE § 161.001(b)(1)(M) (authorizing trial court to terminate parental rights to child if court finds by clear and convincing evidence parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"); *see also In re R.R.A.*, 687 S.W.3d at 279 ("Although termination under (P) is sufficient to reverse the judgment of the court of appeals, we must also review termination under subsections (D) and (E) because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)."). Here, however, there is no dispute that Mother's parental rights to Mike and Ivan were terminated in 2023, and that the trial court did so based on a finding that Mother

applies to suits affecting the parent-child relationship pending in the trial court on the effective date of September 1, 2025. Because the trial court entered its final judgment on July 24, 2025 and the notice of appeal was filed prior to the effective date, Subsection (O) remains in effect for the purpose of this appeal. *See In re G.A.H.*, No. 05-25-00421-CV, 2025 WL 2697297, at *1 (Tex. App.—Dallas Sept. 22, 2025, no pet.) (mem. op.).

endangered Mike's and Ivan's physical or emotional well-being as required for termination under Sections 161.001(b)(1)(D) and (E). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).

Although Mother appealed from the termination of her rights to Mike and Ivan, she challenged only the trial court's finding that termination of her rights to Mike and Ivan was in their best interest. *See In re J.C.D.Y.*, 2024 WL 1334334, at *25. She did not challenge the sufficiency of the evidence supporting the trial court's predicate findings for termination under Section 161.001(b)(1), including the trial court's findings that Mother endangered Mike's and Ivan's physical or emotional well-being as required for termination under Sections 161.001(b)(1)(D) and (E). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). We affirmed the trial court's 2023 order terminating Mother's rights to Mike and Ivan and the Texas Supreme Court denied Mother's petition for review. *See In re J.C.D.Y.*, 2024 WL 1334334, at*33.

The trial court's endangerment finding in the challenged July 2025 order thus does not impose any additional consequences for Mother to which she was not already subject to as a result of the September 2023 order terminating her parental rights to Mike and Ivan. We thus need not address whether there is sufficient evidence supporting the trial court's findings under Subsection (E). *See In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *6 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) (holding appellate court did not need to address

40

endangerment finding because it did not impose any additional collateral consequences).

Moreover, because there is legally and factually sufficient evidence supporting the trial court's finding that Mother committed the predicate act under Section 161.001(b)(1)(P), we need not consider whether there is sufficient evidence supporting the trial court's findings under Subsections (E) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest"); *see also In re N.G.*, 577 S.W.3d at 232.

We overrule Mother's first and second issues.

## Best Interest

In her fourth issue, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights to Jack, John, and Mark is in the children's best interest.

### A.    Applicable Law

The purpose of the State's intervention in the parent-child relationship is to "protect the best interests of the children, not to punish parents for their conduct." *In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116

(Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and

42

the totality of the evidence as well as direct evidence when conducting a best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent

43

when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

## B. Analysis

Multiple factors support the trial court's finding that termination of Mother's parental rights was in the best interest of Jack, John, and Mark, including Mother's lengthy history of endangering her children, who experienced profound neglect and physical abuse while in Mother's care, her ongoing use of marijuana in a manner or under circumstances that harmed or threatened to harm the children, and her unwillingness to accept responsibility for the circumstances that brought the children into the Department's care in 2022.

As to the present and future emotional and physical dangers to Jack, John, and Mark, the evidence shows that Mother endangered the children's well-being by having repeatedly allowed Jack, John, Mark, and their siblings to live in unsafe and unsanitary conditions. *See Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical dangers to child as best interest factor).

44

The record from the 2025 trial reflects that the Department investigator and police officers who visited Mother's home in January 2022 described the home as "unsuitable" and "not livable for the children." The home was filthy and smelled of urine. It was filed with bags of trash, infested with rats and cockroaches, and there was "loose wiring" hanging out of the walls. There was no running water in the home and the toilet and sink in the children's bathroom were filled with urine and feces. There was no food in the kitchen or deep freezer, and there was one mattress on the floor in the master bedroom which Mother shared with her six children. When they were questioned by the Department, Mike and Julie reported that Mother had been leaving them alone for days at a time for the previous six months with fourteen-year-old Mike as the children's primary caretaker.

The Department also found Mike, Julie, Jack, and John living in similar "deplorable conditions" in March 2014. According to the referral, there was a "stench as you walk into the home," it was littered with clothes "and stuff," and it did not have "a sink, a bathroom shower or tub." There is also evidence that in February 2020, Mother and the children were living in a dirty motel room for a week with only one bed and the children would sometimes go to bed without eating. According to the referral, Mike cared for his five younger siblings, including two-year-old Ivan, when Mother was gone.

45

This is some evidence that Mother repeatedly placed her children in dangerous and unsanitary living conditions and left them home alone for days at a time and thus supports the trial court's best interest finding. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at \*16 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (holding evidence parent allowed child to live in unsanitary conditions supports endangerment and best interest findings); *In re E.P.C.*, 381 S.W.3d 670, 683–84 (Tex. App.—Fort Worth 2012, no pet.) (stating evidence parent left young child alone in apartment supports endangerment finding). The trial court could also infer from this evidence that such endangering conduct could reoccur in the future if the children were returned to Mother's care. *See In re D.M.*, 452 S.W.3d at 471 (stating fact finder may infer that past endangering conduct will recur if child returned to parent).

There is also evidence that Mother physically abused the children and exposed them to domestic violence while they were in her care. Mike, Jack, and Mark made outcries of physical abuse by Mother and Julie collaborated their claims. The boys' foster mother testified that Jack, John, and Mark had scars on their bodies that were caused by Mother and their maternal grandmother. They told her that "they always did something bad," but "sometimes they didn't do anything, but they still got a whooping." Mike also told the Department that Ivan's father was "abusive to his mother and has seen him hit his mother." This evidence also supports the trial court's

46

best interest finding. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (stating mother's history of violent abusive conduct directed at child, father, and other individuals supported best interest finding); *see also In re K.S.*, 2014 WL 3867529, at *9–11 (stating evidence children witnessed violence in home supports endangerment and best interest findings). The evidence that Julie told the forensic interviewer that she had been sexually assaulted and although Mother was aware of the abuse, Mother did nothing about it, also supports the trial court's best interest finding. *See In re A.B.*, 125 S.W.3d 769, 778 (Tex. App.—Texarkana 2003, pet. denied) (stating parent's "failure to protect the emotional well-being of the children following the allegations of sexual abuse" supports trial court's best interest finding). A fact finder may infer that such endangering conduct may recur in future if the child is returned to the parent. *See In re D.M.*, 452 S.W.3d at 471 (stating fact finder may infer that past endangering conduct will recur if child returned to parent).

With regard to the present and future physical and emotional needs of the children, the record reflects that Mother failed to meet many of her children's basic needs by failing to provide adequate food and neglecting the children's personal hygiene. *In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.) ("A child's basic needs include food, shelter, clothing, routine medical care, and a safe, stimulating, and nurturing home environment."); *see also Holley*, 544 S.W.2d

at 372 (identifying present and future physical and emotional needs of child as best interest factor); TEX. FAM. CODE § 263.307(b)(12)(A) (stating parent's ability to provide child with "minimally adequate health and nutritional care" is best interest factor).

The record reflects that concerns were raised about the availability and adequacy of food in Mother's home as early as 2019. In May 2019, Julie's teacher reported that Julie was severely underweight and often asked to take food home from school. Mike's father told the Department that when he saw Mike in 2020, Mike was skinny, he appeared malnourished, and his leg bones protruded. Mike also told his father that he went to bed without food some days. The foster mother for Jack, John, and Mark testified that the boys "were not used to having food," and they would eat until they "literally got sick," they stole food, and there "was never a time when they [weren't] hungry." Piaskowski testified that Mother had not met the children's nutritional needs, and the children blamed each other for eating too much. This evidence that Mother did not provide the children with adequate nutrition also supports the court's best interest finding. *See In re D.M.*, 452 S.W.3d at 470 (stating evidence that home had no food and child appeared hungry supported endangerment finding).

The record also reflects that Mother repeatedly neglected her children's personal hygiene for years. In May 2019, Julie's teacher reported that Julie's hygiene

48

was deteriorating, and her clothes had "a very strong smell of urine." Mike's father reported that when he saw Mike in 2020, Mike smelled like mildew, his hair was smelly and matted. When they were removed from Mother's home in January 2022, Jack, John, Mark, and their siblings "had a strong, musty, urine and filth stench," they were wearing smelly, soiled clothing, they had trash or debris stuck in their "severely matted" hair and they were underweight for their ages. It was apparent to the police and to Whitely that none of the children had bathed "for quite some time." This evidence also supports the trial court's best interest finding. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *14, 18 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) (holding "evidence of unsanitary and dangerous conditions in a child's home as well as evidence that a parent has neglected her child's physical condition" supports endangerment and best interest findings); *see generally In re S.G.S*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (reasoning that fact finder could infer from actual neglect of one child that physical and emotional well-being of other children was also jeopardized).

A parent's drug use is also indicative of instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d at 579; s*ee also In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); TEX. FAM. CODE § 263.307(b)(8) (including

"whether there is a history of substance abuse by the child's family" among factors that "should be considered by the court" when "determining whether the child's parents are willing and able to provide the child with a safe environment").

The record reflects that Mother used marijuana in March 2014 while she was pregnant with Mark and she and the children were living in "deplorable conditions." Mother and Mark tested positive for marijuana at Mark's birth in May 2014. *See In re H.M.O.L.*, 2018 WL 1659981, at *13 ("Illegal drug usage during pregnancy is also conduct that endangers the physical and emotional well-being of the unborn child."). In 2020, when Mother and the children had been living in a motel room for a week, Mike's father made a referral to the Department alleging that Mother and her boyfriend spent all of the family's money on marijuana, and Mike had seen Mother smoke marijuana. *See In re J.O.A.*, 283 S.W.3d at 345 (stating parent's illegal drug use, including effect of such use on her life and parenting abilities, may establish endangering course of conduct under subsection (E)); *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("A continuing pattern of illegal drug use. . . implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest.").

While the 2022 case was pending, Mother submitted nine urine and hair samples that tested positive for marijuana or marijuana metabolites. Mother also tested positive for drugs during trial in the 2022 case and after she was discharged

50

from substance abuse treatment twice. *See In re A.M.*, 495 S.W.3d at 580 ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.") (quoting *In re K.C.F.*, 2014 WL 2538624, at *9–10). Mother also had several negative drug tests after the Department filed its motion to modify in October 2024, but her December 23, 2024 hair follicle test was positive for marijuana and she failed to submit to drug testing on multiple occasions. *See In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating refusal to give hair sample permitted court to infer father refused testing because it would be positive).

With respect to Mother's parental abilities, Mother's use of marijuana during the pendency of the case indicates that she lacks the parental abilities necessary to care for the children and supports the trial court's best interest finding. *See In re D.R.*, 631 S.W.3d 826, 835 (Tex. App.—Texarkana 2021, no pet.) ("Mother's use of methamphetamine during the pendency of the case, even after being released from inpatient treatment, showed that she lacked the parental abilities necessary to care for the children, that she failed to learn from the programs available to assist her, and that the existing parent-child relationship was not a proper one.").

Evidence of Mother's unwillingness to accept responsibility for the circumstances that brought the children into the Department's care in 2022 also

51

supports the trial court's best interest finding. Mother's FSP reflects that the Department was concerned because although Mother had completed parenting classes and individual therapy, she remained "in deep denial about the negative effects of her absenteeism, neglect and poor parenting" on the children, she continued to deny that she abused or neglected the children, and she "deflect[ed] and blam[ed] anything the children allege on their time in [the Department's] care." Although Hackett testified that Mother was compliant with her FSP except for the random drug testing requirement, she also testified that the Department was asking the trial court to terminate Mother's parental rights to Jack, John, and Mark in part because Mother had "not tak[en] accountability for the physical abuse and the neglect" of the children that occurred before the September 2023 order.

Mother testified that she had taken responsibility for the reasons the children were removed from her home in 2022 and she "a hundred percent" understood the conditions of her home, and that she was "supposed to be home more hours." She testified that the parenting classes she completed in June 2022 taught her what she had "done wrong and specifically how to change the behaviors." Mother, however, continued to deny, minimize, or excuse the deplorable, unsanitary, and dangerous conditions in her home, including the lack of food and running water, feces in the sink, and rat and cockroach infestation. She also denied leaving them unsupervised at home and claimed that she provided the children with three meals a day even when

she was away. Mother also denied physically abusing the children and when asked about the scars on the children's bodies when they first came into the Department's care in 2022, Mother testified that one scar was caused by Jack's father, and the other scars were from accidents at school, and chicken pox. Mother also testified that she had not used marijuana for a year and a half, despite her positive drug test in December 2024, and she suggested that the positive result was caused by the CBD gummies she had been taking at her doctor's suggestion. As the sole factfinder, the trial court could have disbelieved Mother's testimony that she took responsibility for the conditions that lead to her children being removed and credited Haskett's testimony that Mother had "not tak[en] accountability for the physical abuse and the neglect," and we must defer to the court's findings. *See In re J.F.-G.*, 627 S.W.3d at 311–12 (stating appellate courts should defer to fact finder's determinations regarding witness credibility); *see also In re J.P.B.*, 180 S.W.3d at 574 (noting it is within fact finder's province to access parent's demeanor and to disbelieve parent's testimony).

Although Mother denied causing the children's injuries, leaving the children unsupervised at home, and failing to provide them with sufficient food, it was within the trial court's province, as the sole arbiter of a witness's credibility, to disbelieve Mother's testimony and credit the children's and other witnesses' testimony to the contrary. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of

53

witness credibility and demeanor). Likewise, although Mike testified that Mother never abused him, neglected him, or used drugs in front of him and she had provided him with a safe, stable home with sufficient food, the trial court, as the sole fact finder, could have disbelieved Mike's testimony and instead credited evidence and testimony to the contrary, and we must defer to the court's findings. *See In re J.F.-G.*, 627 S.W.3d at 311–12; *see also In re J.P.B.*, 180 S.W.3d at 574.

By all accounts, the boys' foster parents have provided Jack, John, and Mark with a loving, safe, stable, nurturing, and drug-free home environment and the boys are thriving in their care, thus demonstrating that the boys' foster parents are able to meet their present and future physical and emotional needs. There is also evidence that Jack, John, and Mark are well bonded to their foster parents, whom they referred to as mom and dad, and who wanted to adopt Jack, John, and Mark and their younger brother Ivan. Jack, John, and Mark want their foster parents to adopt them. *See Holley*, 544 S.W.2d at 372 (recognizing desires of child, child's present and future physical and emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, child's desires, and stability of home or proposed placement as best interest factors); *see also In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has

spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires.").

Mother testified that although she had tried to visit with Jack, John, and Mark after the September 2023 order, she was denied the opportunity to do so because the Department was not able to provide the visitation. According to Mother, the Department's failure to arrange for these court-required visits with Jack, John, and Mark denied her an opportunity to bond with the children, and she would have had a closer relationship with them if the Department had arranged for the monthly visits. The evidence reflects, however, that Mother was able to visit with the children on several occasions, and in January or February 2025, the boys refused to visit Mother. Furthermore, Mother had already established a bond with the children before they were removed from her care.

Mother argues that her successful completion of her FSP either weighs in favor of or neutralizes several *Holley* factors, including considerations of the children's needs, any danger she posed, parenting abilities, available programs, stability, the parent's acts or omissions, and any excuses the parent has for her conduct. According to Mother, she satisfied her FSP's requirements because she provided the Department with proof of stable housing and employment, provided proof of income, submitted to psychological assessments in May 2022 and December 2024, completed a parenting class in June 2022, submitted to a substance

abuse assessment in September 2022, and successfully completed substance abuse counseling in November 2022 and May 2023. The fact that Mother has secured housing, provided proof of employment and income, and participated in services is some indication that termination of her rights is not in the children's best interest, but given the evidence of Mother's denial and minimization of the circumstances that resulted in the children being removed from her care and her continued use of marijuana after completing substance abuse counseling twice, the trial court could have reasonably determined that this evidence was not enough to overcome the evidence that termination of her rights to John, Jack, and Mark was in the boys' best interest.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Jack, John, and Mark. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in the best interest of Jack, John, and Mark. *Id.*; *see also In re A.C.*, 560 S.W.3d at 631.

We overrule Mother's fourth issue.

## Conservatorship

In her fifth issue, Mother argues the court abused its discretion in appointing the Department as the sole managing conservator of Jack, John, and Mark and in appointing non-parent caregiver Mary as Julie's sole managing conservator.

Mother argues that the trial court abused its discretion because the Department failed to introduce sufficient evidence that demonstrated any specific, identifiable behaviors on her part that would significantly impair the children's physical health or emotional development. Mother argues that in light of the legally and factually insufficient evidence supporting the trial court's conservatorship findings, she should be named as the children's managing conservator.

### A.    Standard of Review

Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.— Houston [1st Dist.] 2018, pet. denied). Under an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so,

whether the trial court erred in its application of discretion. *Id.* at 588. "The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable." *Id.* A trial court does not abuse its discretion if there is some substantive, probative evidence to support its decision. *Id.* at 587. Evidence is legally sufficient when it would enable reasonable and fair-minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See id.* at 588–89.

## B. Applicable Law

The primary consideration in any conservatorship case "shall always be the best interest of the child." *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000) (quoting TEX. FAM. CODE § 153.002)). The Texas Family Code presumes that a parent should be appointed the child's managing conservator "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 153.131(a); *see Critz v. Critz*, 297 S.W.3d 464, 471 (Tex. App.—Fort Worth 2009, no pet.) ("Under section 153.131 . . . a non-parent may not be appointed a joint managing conservator without overcoming the presumption as to both parents"); *see also* TEX. FAM. CODE

§ 263.404(a) (authorizing trial court to appoint Department as child's conservator "without terminating the rights of the parent of the child" if court finds "appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development" and "it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator").

Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent, will probably cause harm. *See Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). "Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence." *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm. *Id.*

"Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). "The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness." *Id.*; *see also*

*Critz*, 297 S.W.3d at 475 ("Evidence of past misconduct is not alone sufficient to show present unfitness."). While evidence of past misconduct alone may not be sufficient to show present unfitness, "we recognize that a[ ] [parent]'s future conduct may be somewhat determined by recent past conduct." *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.); *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied) (stating parent's past misconduct standing alone may not demonstrate parent's present unfitness but present unfitness "could hardly be shown without reference to the recent past behavior of the parent").

## C. Jack, John, and Mark

Mother argues that the trial court abused its discretion by appointing the Department as the sole managing conservator for Jack, John, and Mark because the Department failed to introduce sufficient evidence that demonstrated any specific, identifiable behaviors on her part that would significantly impair the boys' physical health or emotional development.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of the Department or another person as the child's sole managing conservator may be considered a

"consequence of the termination." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also In re J.D.G.*, 570 S.W.3d at 856.[8]

Because we have overruled Mother's challenge to the portion of the trial court's decree terminating her parental rights to Jack, John, and Mark, the decree divested Mother of her legal rights and duties to these children. *See* TEX. FAM. CODE § 161.206(b) (stating order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Mother does not have standing to challenge the portion of the order appointing the Department as the sole managing conservator of Jack, John, and Mark. *In re J.D.G.*, 570 S.W.3d at 856 (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, did not have standing to challenge conservatorship determination).

## D. Julie

Mother argues that the trial court abused its discretion by appointing Mary as Julie's sole managing conservator because there was insufficient evidence demonstrating any specific, identifiable behaviors on Mother's part that would significantly impair Julie's physical health or emotional development.

---

[8] When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a).

Mother argues that the Department's concerns about her parental fitness are based primarily on "the incident that brought the children into care, as well as the contention that she endangered her children," and the Department failed to prove by a preponderance of the evidence that she endangered Jack, John, Mark, or Julie. As previously discussed, there is clear and convincing evidence that Mother engaged in an ongoing course of conduct prior to the September 2023 order that endangered Jack, John, and Mark by among other things repeatedly allowing Jack, John, and Mark and their siblings to live in unsafe and unsanitary conditions, neglecting the children's personal hygiene and nutritional needs, physically abusing the children, exposing the children to domestic violence, and using marijuana in a manner or under circumstances that harmed or threatened to harm the children. This evidence, which includes evidence of endangering conduct directed towards Julie, demonstrates that Mother's conduct endangered Julie's physical or emotional well-being. *See In re D.T.*, 34 S.W.3d at 636–37 (stating parent's conduct with regard to other children can support finding of endangerment).

Mother testified at the 2025 trial that she had taken responsibility for the circumstances that brought Julie and her siblings into the Department's care in 2022 and that led directly to the termination of Mother's parental rights to Mike and Ivan in 2023. Mother, however, continued to minimize and excuse the unsafe and unsanitary conditions in the home. She also denied abusing the children, leaving

them unsupervised, failing to provide them with adequate nutrition and using marijuana during the year and a half before trial despite testing positive for marijuana in December 2024, five months before she testified in May 2025.

Although Mother had not tested positive for marijuana since December 2024, she failed to submit to approximately six random drug tests during that same period. The trial court could have reasonably inferred from this evidence that Mother had refused to drug test because she was using marijuana. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding fact finder could infer that parent's failure to submit to court-ordered drug testing indicated parent was avoiding testing because she was using narcotics). The trial court also could have reasonably inferred from evidence of Mother's prior use of marijuana in a manner or under circumstances that harmed or threatened to harm the children beginning in 2014, Mother's inability to maintain her sobriety after twice receiving substance abuse treatments, and Mother's failure to submit to drug testing approximately six times within the six months prior to trial, that Mother's drug use could recur, placing Julie's emotional or physical well-being at risk. *See In re De La Pena*, 999 S.W.2d at 528 (stating that while evidence of parent's past misconduct alone may not be sufficient to show present unfitness, "we recognize that a[ ] [parent]'s future conduct may be somewhat determined by recent past conduct"); *May*, 829 S.W.2d at 377 (stating parent's present unfitness "could hardly be shown

without reference to the recent past behavior of the parent"); *see also In re B.K.D.*, 131 S.W.3d at 17 (stating fact finder may infer that past conduct endangering child's well-being may recur in future if child returned to parent).

Evidence of Mother's prior endangering conduct, coupled with evidence of her ongoing minimization of her past endangering conduct, and her failure to address her drug use, as evidenced by her failure to comply with her FSP's drug testing requirement, denial of having used marijuana within a year and a half before trial despite her positive drug test in December 2024, and her pattern of relapsing and using marijuana after substance abuse treatments and periods of sobriety, supports the trial court's finding that appointment of Mother as Julie's managing conservator would significantly impair Julie's physical health or emotional development. *See In re S.T.*, 508 S.W.3d at 492 (identifying "parental irresponsibility" and "bad judgment" as considerations when assessing whether child would be significantly impaired by appointment of parent as child's conservator); *see also In re C.C.*, 720 S.W.3d 41, 64 (Tex. App.—Texarkana 2025, no pet.) (holding mother's illegal drug use presented risk to her ability to parent when drug use was accompanied by lack of safe, stable housing, inadequate income, and child's failure to consistently attend school, all of which established substantial risk of harm to child).

Based on the record before us, we cannot say that the trial court abused its discretion by finding that appointment of Mother as Julie's managing conservator

would significantly impair Julie's physical health or emotional development. *See Whitworth*, 222 S.W.3d at 623 (stating court does not abuse its discretion if some evidence of substantive and probative character exists to support trial court's decision).

We overrule Mother's third issue.

## Conclusion

We affirm the trial court's order modifying the prior order as to Julie and terminating Mother's parental rights to John, Jack, and Mark.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.